**GEORGE & BENJAMIN GENERAL CONTRACTORS, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS DEPARTMENT OF
PROPERTY AND PROCUREMENT and UNLIMITED
CONSTRUCTION, INC., Appellees**

D.C. Civ. App. No. 1994-3

T.C. Civ. No. 937-1993

District Court of the Virgin Islands

Div. of St. Thomas and St. John
Appellate Div.

April 10, 1996

117

Denise George-Counts, Esq., St. Thomas, U.S.V.I., *for Appellant*

Pamela R. Tepper, Assistant Attorney General, V.I. Department of Justice, St. Thomas, U.S.V.I., *for Appellee Government of the Virgin Islands*

Victor Frazer, Esq., St. Thomas, U.S.V.I., *for Named Appellee Unlimited Construction, Inc.*

MOORE, *Chief Judge*

## OPINION OF THE COURT

George & Benjamin General Contractors ["George & Benjamin" or "appellant"] appeals the Territorial Court's December 1, 1993 Judgment denying injunctive relief to prohibit the Department of Property and Procurement of the Government of the Virgin Islands [sometime "Procurement" or "Government" or "appellee"] from awarding a contract to Unlimited Construction, Inc. ["Unlimited"][1] for the completion of Phase II of the Knud Hansen Hospital Complex. Appellant contends that the trial judge should have granted its request for an injunction because the actions of the Government were illegal and thus properly subject to judicial review and modification. Appellee argues that the court's decision below was proper because of the wide discretion afforded to Government agencies in contracting decisions, and that, in any case, the question is now moot because the construction project is virtually complete. For the reasons that follow, we find that the questions before the Court are not moot, and we affirm the trial court's decision.

## FACTUAL BACKGROUND

On or about August 9, 1993, Procurement issued an Invitation for Bids ["IFB"] for "[f]urnishing all labor, materials and equipment necessary for Phase II Knud Hansen Renovations, St. Thomas, Virgin Islands." Joint Appendix ["J.A."] at 42-48. Attached to the preprinted IFB form was a typed sheet titled "Scope of Work — Summary/Base Bid — Phase II" ["Scope of Work — Summary"],

---

[1] Unlimited, named as appellee, did not file a brief or participate in oral argument.

which instructed bidders that the renovation project had been divided into "Base Bid" and "Add Alternates," referring to a "Bid Proposal Form" provided as one of the bidding documents. The scope of the work to be included in the Base Bid was described by reference to certain "Departments" (of the Hospital) as the building renovation portion of the work. This typed sheet further advised bidders that "[t]he construction documents for the add-alternates will be issued as an addendum to the bid documents." To bid on the project, contractors were instructed to submit their proposals on a two-page preprinted form, "Bid for Lump Sum Construction Contract" ["Bid"], to which would be attached a two-page typed form, "Addendum #2" ["Addendum"]; all four pages were to be submitted together as one package.[2] The preprinted Bid form contained standard contracting terminology, and, most significantly for this appeal, included a section labelled "BASE PROPOSAL" where the bidder was to insert the sum for which it agreed "to perform all of the work described in the specifications and shown on the plans."[3] The attached Addendum provided space for the bidder to show a total Base Bid, with a breakdown of items, as well as to give specific sums for each of the Add Alternates. Finally, each bid was to be accompanied by a "Bid Guarantee" in the amount of five percent (5%) of the bid or contract price, which could be in the form of a corporate or surety bond.

While the IFB is far from clear on its face, the parties to this dispute, as well as the other bidders, all understood that the figure to be inserted in the preprinted Bid form as the "BASE PROPOS-AL" was just the Base Bid figure.[4] In other words, the IFB was for a lump sum to include the Base Bid and Add Alternates, even

---

[2] Addendum # 1, assuming there was one, is not involved in this appeal.

[3] Appellant makes much of the fact that only the second page of the Bid was required to be signed by the bidder, arguing that this rendered the Bid more important and determinative than the attached Addendum. The trial judge did not find this argument persuasive since all four pages of the package were essential to the bid and were submitted as a single document. We only add that the Addendum actually may have been more significant to a bidder since it provided the format for breaking down the bid proposal into the Base Bid and Add Alternates, as required by the Scope of Work — Summary attached to the IFB.

[4] The only indication on the documents provided to us that only the Base Bid was to be inserted as the BASE PROPOSAL is the reference under "Total for base bid" to "(Bid for

120

though the "lump sum" to be listed on the preprinted "Bid for Lump Sum Construction Contract" was not the total bid but just the Base Bid figure excluding the amount of the Add Alternate.

This dispute involves two discrepancies in the bid package submitted by Unlimited. First, Unlimited inserted the total of its bid proposal, $2,816,100 (Base Bid of $1,095,500 plus Add Alternates of $1,720,600, as listed on its Addendum) in the space for BASE PROPOSAL on the first page of its Bid (the Addendum is at J.A. 36-37; the Bid is at J.A. 34-35).[5] There is no suggestion by appellant, any of the other bidders, or anywhere in the record that this irregularity was the product of any evil intent, much less an attempt by Unlimited to defraud the Government. Lincoln Gumbs, the principal of Unlimited, testified at trial that the total for the Base Bid and all of the Add Alternates was mistakenly entered as the BASE PROPOSAL by an inexperienced secretary in his office. *Id.* at 311-12.

The trial record further establishes that Procurement's Evaluation Committee readily recognized the transpositional discrepancy in Unlimited's BASE PROPOSAL item on its Bid, immediately verifying the Committee's conclusion that Unlimited intended to submit a Base Bid of $1,095,000 by simply adding up the figures on Unlimited's Addendum for Add Alternates and Base Bid to get the $2,816,100 figure. *Id.* at 291-92, 208, 280-81. The Evaluation Committee correctly evaluated Unlimited's proposal using the $1,095,500 Base Bid figure.

The second alleged irregularity is that Unlimited submitted a bid bond from American Builders Surety, an insurance company not authorized to do business in the Virgin Islands.[6] The trial record establishes that the Government was aware of the difficulty posed for small, local contractors in obtaining bid bonds and that it had established a practice of attempting to accommodate these contractors. *Id.* at 270-71.

---

Lump Sum Construction Contract)" on the Addendum. Joint Appendix ["J.A."] at 36.

[5] Unlimited also submitted a bid bond valued at $141,000 — a sum equal to approximately 5% of $2,816,100, not 5% of the base bid of $1,095,500.

[6] We take the parties at their word (Mr. George, *Id.* at 98-99; Mr. Baker *Id.* at 198-201), although neither side have favored us with a copy of the bond document.

When it came time to actually award the contract, monetary constraints required that only certain of the Add Alternates items be considered for award. Using the $1,095,500 Base Bid figure, Unlimited was the lowest bidder of all contractors submitting bids, whether considered on the Base Bid alone, the total of Base Bid and Add Alternates, or the actual package of bid items allowed by the fiscal restraints, as memorialized in the memorandum of October 6, 1993, from the Evaluation Committee to the Commissioner of Property and Procurement recommending that Unlimited be awarded the contract. *Id.* at 40. George & Benjamin was the second lowest bidder on the basis of the package of bid items, as well as the total of Base Bid and Add Alternates.[7] On October 14, 1993, Procurement sent Unlimited a Notice of Award.

Alleging that the contract had been wrongfully awarded to Unlimited, George and Benjamin filed a letter of protest with Procurement. After it did not receive a response to its protest, George and Benjamin on October 25, 1993, filed an action in the Territorial Court of the Virgin Islands for a temporary restraining order, preliminary injunction and permanent injunction to enjoin Procurement from awarding the contract to Unlimited. On November 2, 1993, the court granted the temporary restraining order and set a hearing on the requests for preliminary and permanent injunction. After two days of hearings, the trial judge denied the injunction on November 16, 1993, dictating his decision into the record from the bench and relying in large part on the decision of this Court that a reviewing court should not disturb a government contract award unless it is "irrational or illegal." *General Engineering Corp. v. Apex Construction, Inc. and the Government of the Virgin Islands*, Civ. No. 92-103, V.I. BBS 92 CV 103 A.DT1 at p. 5 (D.V.I. App.

---

[7] The Evaluation Committee's memorandum also shows that George and Benjamin was not the second lowest bidder when the Base Bid alone was considered. Even if George & Benjamin had submitted the second lowest bid, however, the Committee considered its bid to be technically "nonresponsive" because the surety bond it submitted was not appropriately certified by the bank issuing the surety. Mr. Edward Sibilly, Chief of Procurement's Bureau of Evaluation, Standard and Procedure, testified that George & Benjamin's bid could not have been considered until the problem of the Bank's certification had been resolved. J. A. at 281-89, 291-93.

1993), *vacated as moot,* No. 93-7766 (3d Cir. May 27, 1994).[8] This appeal followed.

Work on the project has continued; estimates of the project's completion varied widely at oral argument on November 2, 1994. This state of affairs led appellee to assert that any appeal of an injunction to halt work on the project is now moot because the project was so near to completion.

## DISCUSSION

### Standard of Review

■ As noted by the trial judge, this Court has adopted the view that reviewing courts should not disturb the decision of government procurement agencies in awarding contracts unless the court finds that decision to have been irrational or illegal. *General Engineering Corp. v. Apex Construction, Inc., supra* p. 7; *see Coco Brothers, Inc. v. Pierce,* 741 F.2d 675, 679 (3d Cir. 1984); Princeton Combustion Research Laboratories Inc. v. McCarthy, 674 F.2d 1016, 1021 (3d Cir. 1982); *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 434 (3d Cir. 1979). On issues of law, this Court's review is plenary. *Nibbs v. Roberts,* 31 V.I. 196 (D.V.I App.1995); *In re Barrett,* V.I. BBS 91CI159A.DX2, 1995 WL 450466 (D.V.I App.Jan. 31, 1995).[9]

### The Issue of Mootness

■ The question of mootness must first be considered briefly. A case is moot when two conditions are met: "(1) it can be said with

---

[8] On November 17, 1993, George and Benjamin filed a Notice of Appeal and an Application for Stay and Injunction Pending Appeal in the Territorial Court. On December 1, 1993, the trial judge entered final judgment. The court denied the motion for stay and injunction on December 10, 1993.

[9] With the 1984 amendments to the Revised Organic Act of 1954 § 23A(b), 48 U.S.C. § 1613a (1995), *reprinted in* V.I. CODE ANN., Historical Documents, 61 (codified as amended) (1995), the Congress has extended the principles of federalism to the judicial system of this Territory. As we have noted elsewhere, "we presently function as the local appellate court for the Territory" and that "the deference to be given rulings of [such] insular appellate courts on matters of substantive local law 'is comparable to that [applied] when, upon appeals from federal district courts sitting in the states, the federal appellate courts are required to follow state law under the rule of *Erie R. Co. v. Tompkins.'*" *HOVIC v. Richardson,* 32 V.I. 336, 343, 894 F. Supp. 211, 215 (D.V.I. APP. 1995) (quoting *De Castro v. Board of Commissioners,* 322 U.S. 451, 459 (1949)); *see Monsanto-Swan v. Government of the Virgin Islands,* V.I. BBS 92CR211A.DT3, 1996 WL 77500 (D.V.I. APP. Jan. 25, 1996).

assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citations omitted). Appellant argues that neither condition is met in this case, and the Government contends that both are met.

■ Regarding the first prong of the mootness inquiry, we look to see whether either of the alleged deprivations might be suffered again by appellant. *Davis* suggests that the violation that must be likely to recur is not only the specific irregularity alleged in this case, but also that it is likely to happen again to the same party, namely, George & Benjamin. *Id.* at 631-32; *see Honig v. Doe,* 484 U.S. 305, 318 (1988). While it is improbable that such a transposition of figures will recur, it is likely that Procurement may continue the practice of accepting bid bonds from companies which are not licensed to do business in the Virgin Islands. Since George & Benjamin is a local contractor who has competed for many government construction projects over the years, *see* J.A. at 19-20, there is a reasonable probability that it might again lose another bid to a contractor that submits such a non-conforming bid bond.

■■ The second prong of the inquiry is more problematic in this context. We agree "that a central concern in determining questions of mootness is to determine whether all or part of the relief requested by the complaining party is still effectively available." *Firefighters Local 1590, etc. v. Wilmington,* 824 F.2d 262, 265 (3d Cir. 1987). At oral argument, both parties were requested to present information to the Court on the current status of the construction project since neither party asserted that the project was complete. Estimates of the amount of work remaining to be completed varied widely.[10] All we can now conclude is that the project was not yet complete as of last November; thus the injunctive relief requested by the appellant, at least with respect to some portion of the dispute, remains available.

---

[10] Appellant estimated that the project was between 25-40% complete based upon an inspection of the work site. Appellee suggested that project was between 70-85% complete based upon an inspection of the work site and an assessment of what supplies had been purchased and what payments had been made to Unlimited.

### The Irregularities in Unlimited's Bid

The underlying question of whether it was proper for the Territorial Court to let stand the Government's decision to award the construction contract to Unlimited is now addressed. We agree that courts should make every effort to avoid getting involved in the process of interpreting complex procurement regulations. The United States Court of Appeals for the District of Columbia Circuit, for example, has noted that

> [t]he court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis. This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements. . . . If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations. Otherwise, the courts would become the forum for all manner of objections to the procurement decisions — objections that counsel can readily relate to the language of some provision or other in some procurement regulation — and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules.

*M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301-02 (D.C. Cir. 1971)(footnotes and citations omitted), cited favorably in the leading case in this Circuit on procurement, *Sea-Land Service, Inc. v. Brown*, 600 F.2d at 434.[11]

---

[11] Even before we get into the intricacies of Virgin Islands procurement rules, regulations and procedures, the facts of this case exemplify why courts are reluctant to involve themselves with the application of these "technical, and often esoteric, regulations to

On the other hand, a court may involve itself when illegality is involved in the procurement process; it then has an affirmative obligation "to insure agency compliance with statutory and regulatory law." *Sea-Land Service,* 600 F.2d at 434. To determine the propriety of the Territorial Court's decision, we thus first analyze whether or not Procurement acted legally in (1) correcting or waiving Unlimited's insertion of the wrong figure on its Bid form without first checking with the bidder or in (2) accepting Unlimited's bid bond even though it had been issued by an insurance company not authorized to do business in the Virgin Islands.

The Transposed Figures

Appellant attempts to make the case that Procurement's manner of dealing with the bid figure was in violation of its regulations and thus illegal. The Government argues that Unlimited's transposition of figures should be seen as a "minor informality or irregularity" governed by the Department's regulations, V.I.R. & REGS. tit. 31 § 235-65 (1974):[12]

> A minor informality or irregularity is one which is merely *a matter of form and not of substance* or pertains to some immaterial or inconsequential defect or variation of a bid from the exact requirement of the invitation for bids, the

---

the complicated circumstances of individual procurements." For example, there is no document in this record explicitly instructing the bidders what to insert as the BASE PROPOSAL, yet the parties to this dispute, as well as the other bidders, all understood that just the amount of the Base Bid was to be inserted. *See supra,* note 4. Moreover, all were aware that Procurement would award the contract to the bidder submitting the lowest responsive bid for the combined total of the Base Bid and the Add Alternates. Further, Albert George, principle of appellant, testified that the "total bid, the base bid plus the alternates, would give the best price to the government to the completion of the project since the intention is to do the *complete* project, not only part. . . . The base bid plus the alternates represent the bottom line." J.A. at 85 (emphasis added). Finally, when the contract was awarded on only some, but not all, of the Base Bid and Add Alternates items, none of the parties or the other unsuccessful bidders, including Mr. George, expressed surprise or concern. Clearly, much more communication, a good deal of which may be relevant to the issues in this case, went on among the parties during the prebid administration of this relatively simple procurement than was presented to the trier of fact.

[12] The Department's regulations concerning competitive bidding are promulgated under the authority of V.I. CODE ANN.tit. 31, § 245. These regulations pertain to Chapter 23 of Title 31 of the Virgin Islands Code. Hereinafter, the regulations are referred to by section number alone.

correction or waiver of which would not be prejudicial to other bidders. The defect or variation in the bid is immaterial and inconsequential when its significance as to price, quantity, quality, or delivery is trivial or negligible when contrasted with the total cost or scope of the supplies or services being procured. The contracting officer shall either give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or *waiver* such deficiency, whichever is to the advantage of the Government. (emphasis added).

The Government's position is that the discrepancy was so obvious — the bidder's intent could be gleaned from merely adding up the figures on the attached Addendum — that there was no need for the Evaluation Committee to call Unlimited, and that Procurement had the discretion to "waiver" the irregularity.

Appellant asserts that Unlimited's failure to put its Base Bid on the front page of its Bid for Lump Sum Construction Contract (and its mistaken insertion instead of its total of Base Bid and Add Alternates) was not a minor informality and should be considered a mistake.[13] As such, appellant argues that Procurement did not have the discretion to correct the mistake without calling Unlimited and verifying its bid, as required by section 235-71:

After the opening of bids the contracting officer shall examine all bids for mistakes. In cases of apparent mistakes and in cases where the *contracting officer has reason to believe* that a mistake may have been made, he shall request from the bidder a verification of the bid, calling attention to the suspected mistake. If the bidder alleges a mistake, the matter shall be processed in accordance with the provisions hereof. Such actions shall be taken prior to award. (emphasis added).

---

[13] Appellant contends that Unlimited's discrepancy cannot be considered an "immaterial or inconsequential defect" because it dealt with the price of the bid. We do not agree since section 235-65 itself provides that a defect or variation on price can be immaterial and inconsequential "when its significance as to price . . . is trivial or negligible when contrasted with the total cost or scope of the supplies or services being procured."

The section then explains how different types of mistakes should be handled. Section 235-71(a)[14] lists apparent clerical mistakes which may be corrected by the contracting officer once the bidder has verified the suspected error. Procurement never contacted Unlimited before the award to verify the Evaluation Committee's assessment of the irregularity on Unlimited's Bid form. Appellant contends that Procurement acted illegally when it violated its own regulations by not verifying the irregularity.[15]

A comparison of the examples the regulations list for "minor informalities or irregularities," as opposed to "mistakes" is instructive. Examples of apparent clerical mistakes under section 235-71(a), which do require the contracting officer to verify the mistake with the bidder, are:

> obvious misplacement of a decimal point; obviously incorrect discounts (for example, 1 percent 10 days, 2 percent 20 days, 5 percent 30 days); obvious reversal of the price f.o.b. destination and the price f.o.b. origin; and obvious mistake in designation of unit.Section 235-65's examples of the types of discrepancies to be considered "minor informalities or irregularities," which do not require verification, include:

> (a) Failure of bidder to return the number of copies of signed bids required by the invitation for bids.
>
> . . . .
>
> (c) Failure of bidder to sign its bid, but only if (1) the *unsigned bid is accompanied by other material indicating the bidder's intention to be bound by the unsigned bid document,* such as a bid guarantee, or a letter signed by the bidder

---

[14] "71(a) **Apparent clerical mistakes:** Any clerical mistake, apparent on the face of a bid, may be corrected by the contracting officer prior to award, if the contracting officer has first obtained from the bidder verification of the bid actually intended. . . ."

[15] Section 235-71(b) provides for correction of more serious mistakes disclosed before award where the bidder requests permission to withdraw its bid due to the mistake or to correct its bid, and also requires that the bidder be contacted to verify that a mistake has been made before the contracting officer is able to take any action. The clear purpose of these provisions is to protect the Government of the Virgin Islands from low bidders having second thoughts and withdrawing their bids, as well as to protect the otherwise low bidder from mistakes that are less than clearly and convincingly established.

referring to and clearly identifying the bid itself . . . .

(d) Failure of a bidder to acknowledge receipt of an amendment to an invitation for bids, but only if:

(1) The *bid received clearly indicates that the bidder received the amendment,* such as where the amendment added another item to the invitation for bids and the bidder submitted a bid thereon . . . . (emphasis added).

A salient theme running through the section 235-65 examples is the ability of the contracting officer to ascertain what the bidder intended, or received in the case of amendments, from within the four-corners of the bid documents submitted and available to Procurement. This is exactly what the Evaluation Committee did in the instant procurement; it immediately recognized the irregularity and just as quickly ascertained the obvious intent of Unlimited from within the four-corners of its bid by adding up the figures on the Addendum. Mistakes, on the other hand, even apparent clerical mistakes under section 235-71(a), require information outside of the bid documents before the contracting officer can determine what was intended. A decimal point may obviously be misplaced, but Procurement would have no way of knowing where the bidder intended to place it without talking to the bidder. In other words, although the mistake may be obvious, the bid actually intended may not be.

█ We find that Unlimited's submission of the total price as its BASE PROPOSAL on its Bid form was a "matter of form and not of substance" and thus a minor irregularity, which could be "waivered" without prejudice to other bidders.[16] For this reason,

---

[16] Appellant suggests that the waiver of the discrepancy transformed a nonresponsive bid into a responsive bid and thus was prejudicial to appellant and all other bidders. We do not find this argument to be persuasive. The types of mistakes which section 235-62(b) of the regulations suggests should render a bidder's proposal non-responsive include: (1) Attempts to protect itself against future changes in conditions, such as increased costs, if total price to the Government cannot be determined for bid evaluation.

(2) Fails to state a price and, in lieu thereof, states that price shall be the "price in effect at time of delivery."

we hold that the Government acted rationally and legally in correcting the amount of Unlimited's Bid.

### The Bid Bond

 The second irregularity in Unlimited's bid package involved its bid bond. Unlimited's bid bond was more than sufficient in amount; however, the bond apparently was issued by an insurance company that was not authorized to provide insurance in the Virgin Islands. Appellant alleges that this deficiency in the bond should have rendered Unlimited's bid nonresponsive, pointing out that Title 22 of the Virgin Island Code governs the provision of insurance for activities occurring in the Virgin Islands. All insurance companies desiring to transact business in the Virgin Islands must obtain certificates of authority. 22 V.I.C.§ 202. Specifically, surety insurance must be provided either by an authorized insurer or by an unauthorized insurer who has secured a surplus-line broker in compliance with other provisions of Title 22. 22 V.I.C. § 1101. Finally,

> [a]ll insurance and insurance transactions in this territory, or affecting subjects located wholly or in part or to be performed within this territory, and all persons having to do therewith are governed by this title; *and where there is a conflict or inconsistency between this title and any other law, this title governs.*

22 V.I.C. § 1 (emphasis added). While appellant concedes that the bidding procedures do not expressly require a bid bond to be issued by a company authorized by the Virgin Islands Insurance Commission, it nonetheless contends that 22 V.I.C. § 1 compels compliance by the Government with the insurance regulations of the Virgin Islands. We agree.

---

(3) States a price but qualifies it as being subject to "price in effect at time of delivery." It is clear that the irregularity in Unlimited's Bid is not the type of error that would render the bid nonresponsive. Accordingly, the other bidders were not prejudiced by the waiver of this minor irregularity to award the contract to the lowest responsive bidder in the best interest of the Government.

Notably, when attempting to defend itself against allegations that its own bid was nonresponsive, George & Benjamin contended that its error was but a "minor irregularity." Reply Br. for Appellant at 1-3. This despite the testimony from Procurement that appellant's bid was could not be corrected in-house from its other bid documents. J.A. at 281-89, 291-93.

Citing no regulation or statute, Procurement argued to the Territorial Court that the requirement of a bid bond was completely discretionary,[17] and thus it could disregard any irregularities in the bid bonds. In fact, this position is flatly contradicted by the provision of the procurement regulations which states that a bid *shall* be rejected "[w]here a bid guarantee is required and a bidder fails to furnish it in accordance with the requirements of the invitation for bids . . . ." Section 235-62(e).[18] Further, appellee suggested that after Hurricane Hugo, local contractors have experienced tremendous difficulty in obtaining bonds. Testimony supporting this proposition from Edward Sibilly, Chief of Procurement's Bureau of Evaluation, Standards and Procedure reads:

> Q: Mr. Sibilly, you have . . . experienced difficulty in obtaining bond in this jurisdiction?
>
> A: Yes.
>
> Q: Would you explain to the Court the experience that you know about?
>
> A: More than 70 or 80 percent of the contractors, especially the local contractors have [found] it very hard to get bonding for projects.
> Q: Do you know of any reason why?
>
> A: Because they can't come up with the capital amount. And after Hugo, the insurance companies left, and a lot of the contractors have been using personal surety. But that's only good for one bid because they can't use the same surety over and over again. So they have been having a very hard time getting bond.

J.A. at 270-71.

---

[17] Whether this proposition may be correct regarding "preferred bidders," the Evaluation Committee determined that "[a]s Federal Funds are involved in this project Preferred Bidders Status did not apply." J.A. at 41. Thus, it is irrelevant whether Unlimited likely would have qualified as a preferred bidder, *i.e.*, essentially on-island, local individuals, and corporations controlled and run by individuals, having resided in the Virgin Islands for 8 years or more. *See* 31 V.I.C. § 236a(c).

[18] The "except as otherwise herein provided" language of section 235-62(e) presumably refers to the treatment of preferred bidders, which has no relevance to this procurement.

In an earlier part of the record, the trial court had the following exchange with Mr. Harold M. Baker, Deputy Commissioner of Property and Procurement:

> The Court: What has been the policy [regarding unauthorized bid bonds] since Hurricane Hugo; since September 17 or 18, 1989?
>
> The Witness: To . . . allow some bond to be accepted. Like the individual surety, for example, a lot of those are being accepted in order to give the contractor the opportunity to proceed with the job because they couldn't get bond.

*Id.* at 217-18.

■ The trial judge apparently made his decision based on the fact that the requirement of bid bonds was within the discretion of the Commissioner of Property and Procurement. In the court's oral findings and decision, he stated: "I don't glean the insurance issue as a big thing because as long as there is no exact requirement in terms of the insurance thing, then I don't glean that to be dispositive." *Id.* at 451. Nevertheless, the IFB for the Knud Hansen Hospital project clearly required bidders to submit bid bonds, and each bidder complied with it. Once Procurement required a bid bond, the bidder was required to furnish it in accordance with the IFB, section 235-62(e), which necessarily includes the requirement that the bond be issued by a company legally authorized by our insurance laws to provide insurance in the Virgin Islands. Mr. Sibilly simply was in error when he testified that "it's a discretionary call" to accept or reject a bid bond in the circumstances of this case. J.A. at 270. Accordingly, Procurement violated its own regulations by accepting Unlimited's bid bond.

■ We thus find that by acting contrary to the insurance laws and regulations regarding bid bonds, the Government acted illegally in awarding Unlimited the contract.[19] We nevertheless affirm the trial judge's denial of an injunction because the Government's

---

[19] We strongly urge the Executive and the Legislature to address the problem so that a solution may be found to the barriers confronting local contractors.

action *in this case* — Procurement's error on the bid bond — does not rise to the level of illegality warranting intervention by a court.

█ In coming to our decision, we draw from decisions within this Circuit and from other jurisdictions regarding the appropriate standards of review and the remedies we may appropriately apply where a government procurement agency has acted illegally in the course of awarding a contract. There is absolutely no evidence in the record to suggest that Unlimited had purposefully attempted to perpetrate some sort of fraud or that Procurement's acceptance of Unlimited's bid bond was the result of favoritism or collusion. Thus, nothing in this procurement thwarted the "primary purpose of a competitive bidding statute . . . [namely,] to protect against fraud, collusion, and favoritism in the issuance of public contracts." *General Engineering Corp. v. Virgin Islands Water & Power Authority*, 805 F.2d 88, 94 (3d Cir. 1986).

Much of our rationale for upholding the trial judge's decision is found in the case law regarding the remedies to be applied in government contract cases. For example, in *Sea-Land*, the Court of Appeals for the Third Circuit deferred to the discretion of the government agency and vacated the lower court's ruling to the contrary. The following factors may be considered in reviewing agency decisions:

> When jurisdiction is exercised in the field of governmental procurement, there are three interests that must be weighed: the practical considerations of efficient procurement of supplies for continuing government operation; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through agency adherence to statutes and regulations. Judicial intervention in procurement disputes necessarily results in delay and the expenditure of funds on behalf of all parties, usually without measurable benefit to the public. Although much must depend on the circumstances, by and large, the courts have recognized the necessity of exercising restraint in interfering with procurement decisions and of recognizing a large measure of discretion in the contracting officers.

*Sea-Land Service*, 600 F.2d at 434.

In our case, an analysis of these three interests strongly favors not disturbing the contract between Unlimited and the Government. It would unquestionably be inefficient to halt construction on the project at this point, and such a hiatus would certainly result in additional costs. Unlimited's bid, as accepted by Procurement, was clearly the lowest bid received. Further, it is difficult to see how the goal of promoting fair treatment for bidders would support suspension of the contract between Unlimited and the Government. While it made a mistake in its bid, Unlimited was nevertheless awarded the contract and began work in good faith. The interests of fairness in no way support terminating Unlimited's contract upon the request of another contractor, George & Benjamin, whose own bid was not only found nonresponsive,[20] but also higher.[21]

As we have ruled previously, courts reviewing government action in awarding contracts should not disturb the decision of the procurement agency unless it was irrational or illegal. As one might expect, however, not every violation of law, no matter how small or inconsequential, requires active judicial intervention. For example,

> only if the violation . . . renders the agency decision *irrational* may the . . . court go on to consider whether a balancing of the three *Sea Land* factors justifies the grant of

---

[20] *See supra,* note.

[21] Our approach is in accord with that of other jurisdictions in shaping remedies in government contracting cases.

The equitable factors which a Court should consider in determining the propriety of such relief include whether the contract has already been awarded to another party and, if so, is being performed; the extent an order awarding the contract to the unsuccessful bidder is necessary to vindicate the interest of the public, and competing bidders, in the agency's adherence to the law; and the cost to the government, and hence to the taxpayers, of substituting an unsuccessful bidder for the successful bidder . . . . *Blue Cross and Blue Shield, Inc. v. U.S. Dep't of Health and Human Services,* 718 F. Supp. 80, 89 (D.D.C. 1989) (quoting *Choctaw Manufacturing Co., Inc. v. United States,* 761 F.2d 609, 619 (11th Cir. 1985)). Again, all but one of these considerations — promotion of the agency's adherence to the law — call for **not** disturbing the contract between Unlimited and the Government at this stage of the game. Under other circumstances, we might well be required to order Procurement to re-bid the contract or assign it to the next lowest, responsive bidder. We caution the Government to heed our warning that government agencies must adhere to their own rules and regulations.

134

a preliminary injunction with all the attendant disruption of orderly procurement processes. In this case, nothing in [the] alleged violations of its procedures persuaded the [trial] court that [the agency's] decision was irrational, either because it "lack(ed) a reasonable basis" or was "fundamentally unfair." Indeed, even assuming . . . that it committed a violation of its own procedures . . . the facts as they appear on this record can support only the conclusion that the "violations" were harmless.

*Princeton Combustion Research Laboratories Inc. v. McCarthy*, 674 F.2d at 1022 (emphasis in original) (citations omitted). The trial judge was thus correct in denying appellant's request for a preliminary injunction because Procurement's action was harmless, even though based in part on an illegal component. An opinion from the District of Columbia Circuit further reinforces our decision in this case:

Thus, the main objective of our effort at framing a remedy is to assure that the government obtains the most advantageous contracts by complying with the procedures which Congress and applicable regulations have provided. Putting the disappointed bidder in the economic position it would have occupied but for the error is normally the best approach to this result. *Where that is impracticable, however, or can only be achieved at a cost to the government that will greatly exceed the benefits derived from requiring observance of the proper procedures in the particular case, we must seek a more reasonable alternative.*

What we said in [an earlier case] is equally applicable here:

In a case such as the present one, it is difficult several months after the occurrence giving rise to litigation to fashion relief. Often past events cannot be reconstructed and, as a result, the injury complained of cannot be adequately corrected. Unfortunately, in this case, the injury was easier to avoid than it is to correct.

135

*In that case, we did not even require reconsideration of the past award.*

*Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 206-07 (D.C. Cir. 1984). (Scalia, Circuit Judge) (emphasis added) (citations omitted). The same result is called for here. Although the Government violated its own regulations and thus acted illegally, the "injury was easier to avoid than it is to correct." We will not require reconsideration of the award but instead will allow it to stand — along with a strong admonition to all agencies of the Government to obey their own regulations strictly.

## CONCLUSION

Since the illegal conduct of the Government in this case constituted harmless error, the decision of the Territorial Court denying the injunction is affirmed. An appropriate order will be entered.

**ANDREWS, Territorial Court Judge, Sitting by Designation, concurring.**

Although I agree with the majority's conclusion, I am constrained to print my exception to their analysis solely with respect to Part C-1 entitled, "The Transposed Figures". This I do to help deter what I consider to be illegal conduct on the part of the government.

The majority found that Unlimited's placement of its Total Bid Proposal, i.e., $2,816,100 ($1,095,500 for Base Bid plus $1,720,600 for Add Alternates) in the "BASE PROPOSAL" section of the bid form, was a matter of form and not substance and thus a minor informality which could be waivered pursuant to V.I.R. & Regs. tit. 31, § 235-65 (1974). With this finding, I differ.

A minor informality or irregularity is defined as

> one which is merely a matter of form and not substance or pertains to some immaterial or inconsequential defect or variation of a bid from the exact requirement of the invitation for bids, the correction or waiver of which would not be prejudicial to other bidders. The defect or variation in the bid is immaterial and inconsequential when its significance as to price, quantity, quality, or

136

delivery is trivial or negligible when contrasted with the total cost or scope of the supplies or services being procured.

V.I.R. & REGS. tit. 31, § 235-65 (1974). Every example in Section 235-65 begins with the word "Failure" as follows:

(a) Failure of bidder to return the number of copies . . .;
(b) Failure to furnish required information . . . [regarding amount of employees];
(c) Failure of bidder to sign its bid . . .; and
(d) Failure of a bidder to acknowledge receipt of an amendment to an invitation for bids . . . .

V.I.R. & REGS. tit. 31, § 235-65(a)-(d) (1974). The salient theme that I see running through these examples is the *omission* of some act by the bidder which does not materially affect the *substance of the bid* (e.g., price, quantity, and/or quality). Here, we have affirmative acts by the bidder:

1) the placing of the Total Bid Proposal ($2,816,100 in lieu of $1,095,500) in the BASE PROPOSAL section; and
2) the submission of a bid bond in the amount $141,000 (approximately 5% of $2,816,100) instead of $54,775 (5% of $1,095,500).

These acts go directly to the substance of bid. They affect the Base Bid price, and governmental cost for that portion of the work, by $1,720,206. Such an effect cannot be considered as immaterial or merely a matter of form. Waiver or correction of such an enormous error should be deemed prejudicial to other bidders. *See* V.I.R. & REGS. tit. 31, § 235-65 (1974). Thus, the procedure for handling errors such as these is not governed by Section 235-65.

Unlimited's error, was in my view, an "apparent clerical mistake", which is provided for in the regulations as follows:

Any clerical mistake, apparent on the face of a bid, may be corrected by the contracting officer prior to award, if the contracting officer has first obtained from the bidder verification of the bid actually intended. Examples of such apparent mistakes are: obvious misplacement of a decimal point; obviously incorrect discounts (for example, 1

137

percent 10 days, 2 percent 20 days, 5 percent 30 days); obvious reversal of the price f.o.b. destination and the price f.o.b. origin; and obvious mistake in designation of unit. Correction shall be reflected in the award document.

V.I.R. & REGS. tit. 31, § 235-71(a) (1974).

The examples above include "affirmative acts" involving the insertion of incorrect figures (e.g., misplacement of decimal point) or words (e.g., incorrect discounts) on the bid form, as well as the misplacement of prices (e.g., reversal of f.o.b. prices). Such errors have the potential of affecting the substance of the bid and *must* be verified prior to correction. This is so despite the fact that *the bidder's intent is obvious from examining the four corners of the bid documents. See* V.I.R. & REGS. tit. 31, § 235-71 (1974). This is precisely what occurred here. Unlimited inserted the incorrect base bid price and the incorrect bid bond figure on the bid form. The government then, was required, but failed, to request verification of the mistake from Unlimited. It therefore acted illegally when it corrected the errors without first obtaining Unlimited's verification.

The facts show that had the government followed the regulations and requested verification, Unlimited would have confirmed the mistakes and instructed the government to correct them in the same manner that it did. Further, the error was not the product of any evil intent. In light of these circumstances and those mentioned by the majority, I would agree that despite the violation, the government's decision to award the contract to Unlimited was rational. In short, I find that the violation was harmless. *Princeton Combustion research Lab v. McCarthy,* 674 F.2d 1016, 1022 (3d Cir. 1982).

For these reasons, I concur with the majority's conclusion.

## ORDER OF THE COURT

AND NOW, this 10th day of April, 1996, after careful review of the record and having considered the submissions and arguments of the parties; and for the reasons set forth in the court's accompanying Opinion of even date;

IT IS ORDERED:

THAT the Territorial Court's Judgment dated December 1, 1993 is AFFIRMED.