**GOVERNMENT OF THE VIRGIN ISLANDS, Appellant**
**v.**
**RONALD CHRISTOPHER, Appellee**

D.C. Crim. App. No. 1995-126

T.C. Crim. No. F13-1995

District Court of the Virgin Islands

Div. of St. Thomas and St. John

December 29, 1997

JOEL H. FELD, ESQ. (Assistant Attorney General, Department of Justice), St. Thomas, U.S.V.I., *for Appellant*

ERIK P. LINDBERG, ESQ., (D'Amour, Jones, Stryker, Duensing & Nichols), ST. THOMAS, U.S.V.I., *for Appellee*

MOORE, *Chief Judge*, FINCH and CABRET, *Judges*

## OPINION OF THE COURT

PER CURIAM

In this criminal appeal, the Government challenges the order of the Territorial Court suppressing certain statements made by the appellee, Ronald Christopher ["Christopher" or "appellee"], as well as a weapon obtained from information disclosed in the statements.

Christopher had been charged with possession of a firearm in an information filed on January 11, 1995. When the trial court was advised on March 13, 1995, that a plea offer had been made by the Government and accepted by appellee, the case was continued to March 17, 1995, for a change of plea. On March 17, 1995, the court ordered counsel for Christopher to file a motion and memorandum to suppress. The following facts were developed at the suppression hearing conducted on May 18, 1995.

### FACTS

On January 2, 1995, at approximately 8:00 p.m., Officers Elton Grant and Terrence Manning were boarding a Delta Airlines flight from St. Thomas to St. Croix. Officer Grant was stopped at the gate by an agent for Delta, who informed him that he was not permitted to wear his gun on the airplane. Pursuant to Delta procedures, Officer Grant placed his gun in his carry-on baggage, which was placed with the other luggage. Upon arriving at St. Croix, Officer Grant discovered that his gun was missing from his bag. Officer Manning called St. Thomas to report the missing gun, and an investigation began about 9:00 p.m. that evening.

Sergeant Randolph DeSuza and Officer Alva Chesterfield were partners investigating this matter, as were Officers John Meyers

and Corine Daniel. Upon questioning some Delta employees, the officers learned that Ronald Christopher and Kenneth Joseph were ground crew employees who loaded the baggage on the flight to St. Croix that evening. Sergeant DeSuza and Officer Chesterfield went to Christopher's home, while Officers Meyers and Daniel went to the home of Mr. Joseph.

When the officers arrived at his home, Christopher was not there. However, as the officers were leaving his house, they met Christopher outside on the street, just as he was approaching his home. The officers explained to appellee that he was not under arrest, but that they needed to speak with him about an incident which occurred at the airport where something was missing from the plane. At the time the officers stopped Christopher, he was carrying a bag. Sergeant DeSuza asked Christopher if he could search the bag, and appellee consented. Nothing was found as a result of this search. Before searching Christopher's bag, Sergeant DeSuza asked him if he would go with them to the police station at Nisky Center so that they could talk about this incident. Appellee agreed and was taken to Nisky in the back seat of the patrol car. The officers did not ask Christopher any questions during their drive to Nisky.

When they arrived at Nisky Bureau, appellee was not placed in a room, but was left standing in an area where the desks are located. While at the desk area, Sergeant DeSuza told Christopher that there was a gun missing from the airplane, to which Christopher responded, "I know where the gun is." Right at this time, Officer John Meyers walked in, and Christopher said, "I know Johnny. I can rap with Johnny." Joint Appendix ["J.A."] at 32. Sergeant DeSuza agreed and then walked away. Christopher went with Officer Meyers into another room and told the officer that "he knew he was wrong and that he wanted to return the weapon back to [the officers], and he wanted [Meyers] to go for it." J.A. at 39. At this point, Officer Meyers viewed Christopher as a suspect. J.A. at 42. Appellee then took Officers Meyers and Daniel back to Tutu where the officers allowed him to go into the house by himself to retrieve the gun, while they remained in the car. Returning to the car, Christopher gave the gun to Officer Daniel, and they all went back to Nisky together. Later that evening, Officer Chesterfield

arrested Christopher for possession of the gun, and about 12:00 midnight, Officer Meyers advised appellee of his rights, which he declined to waive.

On May 22, 1995, the trial judge issued an order suppressing both Christopher's statements and the weapon he had retrieved for the officers. The Government filed this timely appeal.

## ISSUES

The Government asserts that the trial judge erred (1) in holding that Christopher had been subjected to custodial interrogation without being advised on his constitutional rights in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and (2) in determining that Christopher's statements were involuntary and, therefore, inadmissible.[1] This Court has jurisdiction under V.I. CODE ANN. tit. 4, § 39(a)(1). For the reasons stated herein, the trial court's order will be vacated and the case remanded to the Territorial Court for trial or other disposition.

## DISCUSSION

■ In deciding this appeal, the Court exercises mixed standards of review. The Territorial Court's findings of fact may be reversed only if clearly erroneous. *Prosser v. Prosser*, 34 V.I. 139, 921 F.Supp. 1428 (D.C.V.I. 1996); 4 V.I.C. § 33. However, the trial court's legal conclusions are subject to plenary review. *George & Benjamin General Contractors v. Government of the Virgin Islands*, 34 V.I. 117, 921 F.Supp. 304 (D.CV.I. 1996); *Nibbs v. Roberts*, 31 V.I. 196 (D.C.V.I. 1995).

■■ In order to safeguard an individual's Fifth Amendment privilege against self-incrimination, the Supreme Court held that the government may not introduce statements made by an individual, who is subject to "custodial interrogation," unless he first has been given his *Miranda* warnings.[2] The Court defined "custo-

[1] Although the issue of voluntariness was raised by the Government in its brief, we need not decide this issue as we have found that there was no custodial interrogation.

[2] In *Miranda v. Arizona*, 384 U.S. 436, reh'g denied, 385 U.S. 890 (1966), the Supreme Court held that a suspect in police custody must be given the following warnings before any interrogation: that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and

dial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 445. Since *Miranda,* the United States Court of Appeals for the Third Circuit has set forth a two-pronged test to facilitate the determination of whether there has been "custodial interrogation." First, a court must "determine whether the suspect was in 'custody.' . . . If the suspect was in 'custody,' the court then must decide whether the police interrogated him." *United States v. Mesa,* 638 F.2d 582, 585 (3d Cir. 1980) *(citing Orozco v. Texas,* 394 U.S. 325 (1969) and *Rhode Island v. Innis,* 446 U.S. 291 (1980)). The presence of *both* a custodial setting and official interrogation is required to trigger *Miranda* warnings, and therefore, in the absence of one or the other, *Miranda* is not implicated. *See Miranda,* 384 U.S. at 477-78.

The custody determination is the initial and, generally, the central inquiry for *Miranda* purposes. In *Thompson v. Keohane,* 116 S. Ct. 457 (1995), the Supreme Court stated that the ultimate inquiry essential to the determination of whether a suspect was "in custody" is whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Thompson,* 116 S.Ct. at 465 *(citing California v. Beheler,* 463 U.S. 1121, 1125 (1983)). However, in order to assess the "restraint on freedom of movement," a court must first examine the circumstances surrounding the interrogation. The relevant inquiry then becomes, "given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *Id.* "Relevant circumstances include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" *United States v. Ventura,* 85 F.3d 708, 711 (1st Cir. 1996) *(citing United States v. Masse,* 816 F.2d 805, 809 (1st Cir. 1987)). This test is objective, and the subjective beliefs held by the officers or the person being interrogated are not germane. *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 1529 (1994).

---

that if he cannot afford an attorney one will be appointed for him before any questioning if he so desires.

The other component for *Miranda* purposes is interrogation, which has been defined as any "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-301. This definition includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* The Supreme Court has also recognized that "[i]n deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30, *reh'g denied*, 483 U.S. 1034 (1987). However, where government actions do not implicate this purpose, interrogation is not present. *Id.*

In the case *sub judice*, the trial court found that Christopher was in custodial interrogation from the time he was picked up at his home in Tutu, and that the failure to advise him of his rights at that time necessitated suppression of the confession and any fruits derived therefrom. In reaching this conclusion, the trial judge found that Christopher had been interrogated by several of the officers. The judge also determined that Christopher had admitted to taking the gun as a result of the interrogation.[3]

After a careful review of the record, we conclude that several of these factual findings of the trial court are not supported by the evidence and are thus clearly erroneous. Most importantly, there is no basis for the judge to have found that the officers took Christopher into custody when they met him in Tutu. What the record does establish is that Sergeant DeSuza informed Christopher when he met him outside his home that he was not under arrest, and that they needed to speak with him about an incident which occurred at the airport where something was missing from

---

[3] The trial court appears to have found that the officers viewed Christopher as a suspect and to have considered this as a significant factor in her ruling that *Miranda* had been violated. As made clear in the text above, the controlling factors which trigger the *Miranda* warnings are the person being in police custody and being questioned or interrogated by the police while in such custody. Whether the police view the person as a suspect is not relevant to an inquiry on the applicability of *Miranda*.

the plane. Sergeant DeSuza *asked* Christopher if he would go with them to the Nisky Bureau and he agreed. Christopher was neither forced to get in the car, nor was he forced to go to the police station. Even though Christopher was driven to the police station in the back seat of a patrol car, the record is void of evidence that any coercive or overreaching tactics were employed at any time during this encounter.

Furthermore, up until he blurted out that he knew where the gun was, there is no evidence which would support a finding that Christopher was not free to leave Nisky or that he reasonably could have believed that he was not free to leave. Any psychological restraint Christopher contends it was reasonable to feel under these circumstances, i.e. that it was late at night and he relied on the police to return him to his home (Brief for Appellee at 3), did not amount to the coercive police custody contemplated by the *Miranda* Court. *See Oregon v. Mathiason*, 429 U.S. 492 (1977) (defendant, who came voluntarily to the police station, was immediately informed that he was not under arrest, and gave a half hour interview during which he confessed to burglary, was not in custody or otherwise deprived of his freedom of action in any significant way).

■ There is no evidence in the record to suggest that appellee was subject to compelling influences, psychological ploys or that any questions had been put before Christopher when he said "I know where the gun is." Rather, the record does demonstrate that Sergeant DeSuza was explaining to Christopher that a gun was missing from the belly of the plane when Christopher said that he knew where the gun was. Appellee argues that his statement was in direct response to the interrogative conduct by Sergeant DeSuza. However, "[t]he predicate of *Miranda* is the inherently coercive nature of police interrogation of a person in custody; it cannot have application to a situation where one, not under stress of interrogation, simply volunteers a statement . . . ." *United States v. Fioravanti*, 412 F.2d 407, 413-14 (3d Cir.), *cert. denied*, 396 U.S. 837 (1969). Chief Justice Warren stated in *Miranda* that "[v]olunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Miranda*, 384 U.S. at 478. As such, appellee's noncustodial statement cannot properly be considered the result of police

interrogation and it therefore does not fall within the meaning of *Miranda*.

Until Christopher told Sergeant DeSuza and Officer Meyers that he knew where the gun was located, he was, at best, a tenuous lead, a place to begin an investigation, along with his co-worker, Kenneth Joseph. Even when Christopher told the officers he knew it was wrong to take the gun and became a definite suspect in their minds, *Miranda* warnings were not required. *See Minnesota v. Murphy*, 465 U.S. 420, reh'g denied, 466 U.S. 945 (1984); *Mathiason*, 429 U.S. at 495. The Supreme Court has made clear in no uncertain terms, that any inquiry into whether the officers have focused their suspicions upon the individual being questioned is not relevant for purposes of *Miranda*. Stansbury, 114 S. Ct. at 1530. It was "'the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements.'" *United States v. Caiello*, 420 F.2d 471, 473 (2d Cir. 1969), *cert. denied*, 37 U.S. 1039 (1970) (citation omitted). What is required is custodial interrogation by the police.

■ From the testimony at the suppression hearing, Christopher could not have been in "custody" before Sergeant DeSuza received an indication that he knew where the gun was located. Moreover, even if there were clear evidence on the record that Christopher was not free to leave after he volunteered that he knew where the gun was, this does not end the court's inquiry for *Miranda* purposes. The second prong of the test set forth in *Mesa* requires this Court to decide if there was police interrogation in connection with the statement made to Officer Meyers. *Mesa*, 638 F.2d at 585. The record does not support the trial judge's finding that what Christopher told Officer Meyers was in response to questioning. Right after Christopher blurted his admission to Sergeant DeSuza, Officer John Meyers walked into the office and Christopher said he wanted to "rap with Johnny" because he knew him. J.A. at 32. Officer Meyers then took Christopher into a back room where appellee told Meyers that "he [knew] he was wrong and that he wanted to return the weapon back to [the police], and he wanted [Officer Meyers] to go for it." J.A. for 39. We therefore reject

200

Christopher's contention that he was subject to custodial interrogation because he was taken into a back room by Officer Meyers.[4]

## CONCLUSION

■ We hold that the Territorial Court clearly erred when it determined that appellee was in custodial interrogation when he blurted out the admission to Sergeant DeSuza that he knew where the gun was located and when he told Officer Meyers that he knew he was wrong and wanted to return the weapon. The trial court clearly erred when it suppressed Christopher's statement and the gun obtained as a result of the statements. For the reasons expressed herein, the Territorial Court's Order of May 22, 1995, suppressing appellee's statements to the officers and all evidence derived therefrom, will be vacated and the matter remanded for further proceedings consistent with this opinion. An appropriate order will enter.

DATED this 29th day of December, 1997.

## ORDER OF THE COURT

AND NOW, this 29th day of December, 1997, after careful review of the record and having considered the arguments and submissions of the parties; and for reasons set forth in the Court's accompanying Opinion of even date;

IT IS ORDERED AND ADJUDGED that the May 22, 1995 ruling of the Territorial Court suppressing Christopher's statements and confessions and any and all evidence derived directly and indirectly from appellee's statements, is VACATED and the matter is REMANDED to the Territorial Court for further proceedings consistent with this Opinion.

---

[4] The *Miranda* Court was concerned with the possibility of a suspect being isolated in a room and "surrounded by *antagonistic forces*," *Miranda*, 384 U.S. at 461 (emphasis added), such as law enforcement officials, conducting *"persisten[t and] relentless questioning." Id.* at 455 (emphasis added); *see Government of the Virgin Islands v. Roberts*, 19 V.I. 196, 205 (D.C.V.I. 1982) ("[T]he key aspect of the custodial setting, as described in *Miranda* is the isolation of the suspect in a room that is dominated by the law enforcement officials who will interrogate him."). The element of antagonistic law enforcement officers is absent from this case. It was Christopher who wanted to "rap with Johnny," because he was both familiar and comfortable with Officer Meyers.