

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-19-1999

# USA v. Bradley

Precedential or Non-Precedential:

Docket 97-5462

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Bradley" (1999). *1999 Decisions.* Paper 103.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/103

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-5462 and 97-5464

UNITED STATES OF AMERICA

v.

WILLIAM F. BRADLEY,

a/k/a FRANKLIN BRADLEY

William F. Bradley,

      Appellant in No. 97-5462

UNITED STATES OF AMERICA

v.

JACKIE R. MATTISON,

      Appellant in No. 97-5464

On Appeal from the United States District Court

for the District of New Jersey

District Judge: Honorable William G. Bassler
(D.C. Crim. Nos. 96-00052-2 and 96-00052-1)

Argued February 17, 1999

BEFORE: GREENBERG, ROTH, and LOURIE,*
Circuit Judges

(Filed: April 19, 1999)

_____

*Honorable Alan D. Lourie, Circuit Judge of the United States Court of
Appeals for the Federal Circuit, sitting by designation.

Elizabeth Ferguson (argued)
Assistant United States Attorney
George S. Leone
Assistant United States Attorney
Faith S. Hochberg
United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

 Attorneys for Appellee

Raymond A. Brown
Brown & Brown
One Gateway Center
Suite 510
Newark, NJ 07102

 Attorneys for Appellant in
 No. 97-5462

Thomas R. Ashley
Ashley & Charles
50 Park Place, Suite 1400
Newark, NJ 07102
Alan L. Zegas (argued)
Gina L. Mendola
Sharon B. Kean
552 Main Street
Chatham, NJ 07928

 Attorneys for Appellant in
 No. 97-5464

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

The case comes on before this court on the appeals of William F. Bradley and Jackie R. Mattison following their

convictions for certain offenses in the district court at a two-month trial. We have consolidated their appeals and dispose of both in this opinion.

Mattison was Chief of Staff for Sharpe James, the Mayor of the City of Newark, from approximately 1987 through early 1996, and was also a New Jersey State Assemblyman during that period. As Chief of Staff, Mattison acted as the Mayor's liaison between the City's Business Administrator and its department heads, ran the Mayor's office and agencies, served as liaison with the city council, boards and commissions, acted as the Mayor's representative at business meetings, and served as the Mayor's lobbyist in Trenton. The grand jury named Mattison's long-term girlfriend, Janice L. Williams, who was in the hair salon business, as an unindicted co-conspirator. Mattison and Williams together owned a house and shared a rented safe-deposit box. Moreover, Mattison opened bank accounts in Williams' name in trust for their daughter. During the course of the investigation in this case the FBI seized $157,000 in cash from lockboxes in Williams' house and evidence of that seizure was admitted at the trial.

Bradley was an insurance broker/financial consultant in the late 1980s, running a business called Bradley Financial Services from an office in Milburn, New Jersey. Bradley had known Williams, through Mattison, for about 15 years at the time of trial. The evidence at the trial demonstrated that Mattison helped Bradley in his role as a consultant for two companies, Great West Assurance Company and Corroon & Black, to obtain and maintain contracts with the City and the Newark Board of Education. The City chose Great West as a provider of deferred compensation plans for City employees, and the Board of Education chose Corroon to provide insurance with Bradley as its minority subcontractor.

There was evidence that Mattison provided Bradley with official favors with respect to those contracts in return for a series of corrupt payments from Bradley. In particular, Bradley gave two checks payable to Mattison to him, one for $4,457.50 in September 1990 and one for $1,640 in January 1991. Bradley labeled the first check "fees" and the second "consulting." Mattison deposited the first into

his personal bank account and cashed the second. Bradley made three checks payable to Williams for Mattison's direct and indirect benefit. The checks were for $3,600, dated October 8, 1991, $3,600, dated November 13, 1992, and $3,575, dated October 13, 1994. Williams deposited the first check into a new account she opened with the deposit but she added no other deposits to the account. She withdrew the entire balance in a check payable to cash on February 5, 1992. She deposited the second check into her personal checking account, and paid certain of Mattison's bills with it. She deposited the third check into her checking account and, over the next nine days, made cash withdrawals from the account for $2,000, $1,000 and $800.

Thus, Bradley made total payments to Mattison of $16,872.50. Mattison did not reveal the receipt of these payments on financial forms he was required to file by reason of his public positions. Williams testified that the payments Bradley made to her were loans, and Bradley claimed that the first check he wrote to Mattison was a repayment of a loan.

The government demonstrated that Mattison referred Bradley to Great West when it was seeking the contract to provide the City's deferred compensation plan. Bradley, in fact, became Great West's consultant. Mattison also furnished Bradley with information useful to Great West in seeking the contract and Bradley indicated to Great West that Mattison would aid it in winning the contract, which he did. Significantly, the assistance Mattison gave to Bradley included ensuring that a potential competitor did not offer a competing deferred compensation plan to the City.

The evidence showed that the Newark Board of Education was selecting an insurance plan in 1989-90 to cover its buildings and other property. Under applicable rules, Corroon was required to have a minority contractor participating with it and Mattison vouched for Bradley for that role. Corroon paid Bradley an unusually high commission, but Bradley did little work to earn it. A search of Bradley's office revealed correspondence addressed to Mattison, some confidential, pertaining to the Board of Education contract. After Corroon secured the contract in

4

1990, Bradley was unable to obtain minority certification and lacked malpractice insurance necessary for him to comply with the contract. Nevertheless, through Mattison's intervention, Corroon decided to pay Bradley his commission in September 1991, despite initially stopping payment on a check to him.

Bradley and Williams testified that the various money transfers related to loans, but the government argued that their explanations were not convincing. For example, Williams testified that her loans from Bradley had no terms, and that there were no written records kept about them. Bradley testified that his first check to Mattison was repayment for a loan Mattison had made to him to purchase a co-op, but evidence showed that he borrowed money for that purpose from a woman he was dating. While Bradley stated that he wrote "consulting" on that check so he could deduct it from taxes, he had not filed tax returns since 1989, leading to the tax evasion conviction in the case. Moreover, Bradley was in financial difficulties during this period and thus it is not likely that he would have been in a position to lend Williams money. Furthermore, while Williams stated the loans were for her hair salon business, the business was not in serious trouble, and she had funds available to her from a City program and in her own accounts. Also, in 1993 when Bradley sought a minority business certification he did not indicate that he had loans receivable as assets.

A grand jury returned a 26-count superseding indictment against Mattison and Bradley. It charged both in counts one through 19 with: conspiracy to accept corrupt payments; accepting money to influence and reward; a scheme to extort money under official right, violating the Hobbs Act; use of a facility in interstate commerce to accept a benefit not allowed by law to influence the performance of Mattison's duties contrary to New Jersey law; and use of mail and wire fraud to deprive the citizens of Newark and New Jersey of their right to honest services of a public official. It charged Bradley separately in seven counts for three offenses: making a false declaration before the grand jury; false use of a social security number; and tax evasion from 1989-1993.

5

The court dismissed three jurors during and after the summations at the trial. The court dismissed the first, Moldow, to attend a family funeral. The court dismissed the second, Jefferson, one day later, for sleeping. The court dismissed the third because the juror had vacation plans.

During the early stages of the trial, jurors mentioned that Jefferson had an odor problem and the court moved her seat so she was further away from the other jurors. Later the Assistant United States Attorney told the court he thought that Jefferson was eating paper. The jurors, however, did not make any subsequent complaints regarding odor problems or any other issue concerning Jefferson. When near the end of the trial Moldow brought her request to leave the jury to the court, she asked if the court would dismiss the other alternates. At that time the court asked her if there was something she wanted to tell it. Moldow then stated that she thought Jefferson, who was an alternate, was not a good listener and had made up her mind with respect to the outcome of the case. The court also asked if the odor issue continued. The court told the parties about the situation, and the court placed Moldow under oath for questioning.

Moldow stated that near the start of trial, she had overheard Jefferson during lunch mutter a comment about making up her own mind and not listening to the court. Moldow said the remark shocked her and that she asked Jefferson what she had said, but that Jefferson denied saying anything.

The court then told the parties that it had noticed Jefferson sleeping. It then swore in one of its law clerks, who testified that during the government's closing, she had noticed Jefferson sleeping. The defendants had the opportunity to cross-examine the clerk but did not do so. The court expressed its desire to question Jefferson, but the defendants opposed that procedure. The court then decided to delay questioning her in recognition of her status as an alternate.

Ultimately the court dismissed the juror who had vacation plans. The court then stated that it had observed that Jefferson was not paying attention during the

defendants' summation. The defendants at that time changed their position, and urged the court to examine Jefferson. The court offered to voir dire all jurors about the comment Moldow overheard, but it did not do so. After further discussion, the court dismissed Jefferson without questioning her. We understand that if the court had not excused Jefferson she would have deliberated in this case. Eventually the jury convicted both defendants on all counts.

The court calculated Mattison's guidelines range at 33-41 months, and it sentenced him to 41 months imprisonment on each count to run concurrently, three years' supervised release on each count, also to run concurrently, 400 hours of community service, a fine of $25,000, and special assessment of $950.

Bradley's guidelines range was 46-57 months, and the court sentenced him to concurrent 46-month custodial terms on each count, to three-year terms of concurrent supervised release, a fine of $7,500, and a special assessment of $1,300.

II. DISCUSSION

A. Whether the district court abused its discretion when it allowed the government to adduce evidence that $157,000 was found in Williams' attic to impeach her testimony.

On this appeal Mattison has filed briefs in which Bradley has joined. The defendants argue that evidence of the $157,000 recovered from Williams was "highly inflammatory" and "unfairly prejudicial" and that the jury could not "compartmentalize" the evidence even with the court's limiting instructions. Brief at 22-23. They argue that while no effort was made to link the cash to Mattison, the evidence "powerfully suggested" that Mattison had something to do with it, as it was found in Williams' home. Id. at 23.

The government called Williams as a witness following a grant of immunity to her. Testimony demonstrated that the FBI had found the $157,000 in cash in lockboxes in the

7

attic of her house during a November 9, 1995 search made in connection with the investigation against Mattison and Bradley. Williams claimed that she had found the money in her father's house a year after his death, on approximately October 24, 1995, and that she had not put the money in a bank because she was waiting to discuss the matter with a sister. The government stated that the evidence was admissible to impeach Williams' testimony that she had lent money she obtained from Bradley's first loan to her, in 1991, for $3,600, to her father. In this regard, the government suggested that if her father had had so much money, he would not have borrowed from Williams. The government also contended that evidence of the money impeached her testimony that Bradley's three payments to her were loans as Williams did not repay Bradley at the time she found that money. Moreover, it argued that the evidence demonstrated that Williams' grand jury testimony that she withdrew $3,500 in cash in February 1992 for her father was false, and had to be changed at trial where Williams said she gave some money to her father and used some money for personal bills.

The government had a legitimate reason to offer the evidence to attack Williams' credibility. The court gave limiting instructions to the effect that the evidence with respect to the $157,000 was admitted only to impeach Williams, and that the prosecution did not suggest that there was a connection between the cash, the defendants, and any crime.

The court's decision to admit the evidence was proper. See Carter v. Hewitt, 617 F.2d 973, 972 (3d Cir. 1980) ("prejudice" entails a determination on "an improper basis of decision"). In making a Fed. R. Evid. 403 determination, the district court is required to balance the probative value of evidence against its prejudicial effect. The district court "must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant." Government of the Virgin Islands v. Archibald, 987 F.2d 180, 186 (3d Cir. 1993) (internal quotation marks and citations omitted). Here evidence regarding the $157,000 had a legitimate purpose and there was not "an overwhelming probability" that the

jury would have been unable to follow the limiting instructions, or "a strong likelihood" that the evidence would be "devastating" to the defendants. United States v. Vaulin, 132 F.3d 898, 901 (3d Cir. 1997). In the circumstances, the court did not abuse its discretion in admitting it.

B. Whether it was proper for the court to dismiss Jefferson for sleeping without a voir dire of her.

The defendants argue vigorously that the court erred in dismissing Jefferson. We review the court's actions in this regard for an abuse of discretion. See United States v. Bertoli, 40 F.3d 1384, 1392 (3d Cir. 1994).

The court had a legitimate basis to dismiss Jefferson. Under Fed. R. Crim. P. 24(c), a court may dismiss jurors if they "become or are found to be unable or disqualified to perform their duties." The defendants argue that the court's stated reason for dismissing Jefferson, that she was sleeping, was only a "pretext," and that the court and the government had singled her out and were looking for ways to remove her. But the record shows that the court dismissed her for inability to serve as a juror, and that the court had sufficient information to support the dismissal and so did not have to voir dire her or the other jurors with respect to this point. See, e.g., United States v. Bertoli, 40 F.3d at 1395; United States v. Reese, 33 F.3d 166, 173 (2d Cir. 1992).

The defendants downplay the fact that the court itself noticed Jefferson sleeping: first, when it overheard someone snoring loudly during the government's summation, then, when it observed Jefferson snoring during the defendants' summation; thus, its dismissal was not solely based on its law clerk's observations. The court could take judicial notice of the conduct of a juror in open court. See, e.g., United States v. Carter, 433 F.2d 874, 876 (10th Cir. 1970). Moreover, the court did not base its decision on ex parte communications with its clerk. Rather, it put the clerk on the stand to be cross-examined. The defendants refused to question the clerk, and now argue that this is because they did not want to risk attacking the court through its extension, the clerk. Yet the defendants' attorneys were

9

quite willing to argue with the court itself regarding its observation that Jefferson was sleeping, and were willing to question whether the court had observed other jurors sleeping as well. Furthermore, when the court initially offered to voir dire Jefferson the defendants objected to that procedure, stating that at that point she should not be singled out, and that there was no basis for the inquiry.

After the summations, the situation changed. At that point the defendants argued that Jefferson should be examined, along with all other jurors, concerning her potentially prejudicial comment which Moldow overheard. The court offered to do so but after further discussion decided to dismiss Jefferson finding that there was no reason to question her based upon Moldow's testimony of April 16, 1999 because it was clear that Jefferson had not been attentive during the closings and should be dismissed on that basis. We find that the court's procedure was not an abuse of discretion. See United States v. Console, 13 F.3d 641, 669 n.34 (3d Cir. 1993).

C. Whether the court properly instructed the jury on the Hobbs Act.

The defendants challenge the court's instructions to the jury on the Hobbs Act Count 6 charge for extortion under color of official right, 18 U.S.C. SS 1951(a)(b)(2) and (3) and 2. They argue that the court improperly refused to charge that in a non-campaign case like this one, an express agreement must be shown.[1] We exercise plenary review on this issue. See Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 135 (3d Cir. 1997); United States v. Zehrbach, 47 F.3d 1252, 1260 (3d Cir. 1995).

The court's instruction was as follows:

> So if a public official agrees explicitly or implicitly to take or withhold some action for the purpose of obtaining money for someone else, that constitutes

_____

1. Campaign contribution cases present special problems because persons who hope that their interests will receive favorable treatment from elected officials legitimately may make campaign contributions to those officials. See McCormick v. United States, 500 U.S. 257, 272-73, 111 S.Ct. 1807, 1816 (1991).

10

> extortion. The public official need not fulfill the promise
> of the payor to do or not to do an official act, although
> the official's failure to influence may be considered
> along with all of his conduct in determining whether or
> not he possessed the intent to commit the crime. The
> crime is completed at the time when the public official
> knowingly accepts the benefit in return for his
> agreement to perform or not to perform an act related
> to his office. Moreover, the government does not have to
> prove that there was an express promise on the part of
> the public official to perform a particular act at the time
> of the payment.
>
> In sum then, it is sufficient if the public official
> understands that he is expected, as a result of the
> payment, to exercise particular kinds of influence or to
> do certain things connected with his office as specific
> opportunities arise.

App. at 6269-70 (emphasis added).

As the government argues, this instruction complies with
the most recent Supreme Court holding on the issue of
whether an agreement is required for conviction under the
Hobbs Act. In Evans v. United States, 504 U.S. 255, 268,
112 S.Ct. 1881, 1889 (1992), the Supreme Court held that
"the [g]overnment need only show that a public official has
obtained a payment to which he was not entitled, knowing
that the payment was made in return for official acts," in
order to establish extortion under color of official right
under the Hobbs Act. Significantly, the Court "reject[ed]
petitioner's contention that an affirmative step is an
element of the offense of extortion `under color of official
right' and need be included in the instruction." Id.

Several courts of appeals also have turned to Justice
Kennedy's concurrence in Evans to hold specifically that no
explicit promise is required. In Evans, Justice Kennedy
wrote that "[t]he official and the payor need not state the
quid pro quo in express terms, for otherwise the law's effect
could be frustrated by knowing winks and nods." Id. at
274, 112 S.Ct. at 1892 (concurring opinion). The Court of
Appeals for the Second Circuit, for example, drawing upon
Justice Kennedy's concurrence, has held that, in non-

11

campaign cases, "proof of an explicit promise to perform the official acts in return for the payment is not required." United States v. Delano, 55 F.3d 720, 731 (2d Cir. 1995); see also United States v. Hairston, 46 F.3d 361, 365 (4th Cir. 1995) (quid pro quo need not be express; government only must show that public official obtained payment to which he was not entitled knowing that payment was in return for official act). Here, the government proved the quid pro quo relationship, though it did not show and did not have to show that the defendants had an express agreement.

The defendants point to cases from the Court of Appeals for the Eleventh Circuit to support their position. Brief at 36-37. In United States v. Martinez, 14 F.3d 543, 552-54 (11th Cir. 1994), the court of appeals held that the district court had failed to instruct the jury on the quid pro quo relationship, which it construed to mean "explicit promise." Yet it noted that in Evans the Supreme Court, in discussing an earlier Hobbs Act case, stated that the jury instruction satisfied "the quid pro quo requirement of McCormick because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts[.]" Martinez, 14 F.3d at 553 (quoting Evans, 504 U.S. at 268, 112 S.Ct. at 1889). In McCormick, "proof of a quid pro quo" is defined as a "promise of official action or inaction in exchange for any payment or property received." McCormick v. United States, 500 U.S. 257, 266, 111 S.Ct. 1807, 1813 (1991). The Court did not in McCormick, or later in Evans, require an "express" or "explicit" promise in cases such as this involving payments outside of a campaign contribution context. Nevertheless, in United States v. Davis, 30 F.3d 108, 109 (11th Cir. 1994), the court of appeals adhered to Martinez.

We will not follow the Court of Appeals for the Eleventh Circuit as in our view, as Justice Kennedy explained, a conclusion that in a Hobbs Act case the government has to demonstrate that the public official made an express promise to perform a particular act and that "knowing winks and nods" are not sufficient would frustrate the act's effect. Evans, 504 U.S. at 274, 112 S.Ct. at 1892 (Kennedy,

12

J., concurring). In the circumstances, we conclude that the court's instruction was correct.

D. Defendants' other arguments.

The defendants raise the following additional arguments:

> (1) The district court's erroneous interpretation of the Wire and Mail Fraud Act and improper jury charge violated defendants' federal constitutional rights to due process and to a fair trial;

> (2) The district court's erroneous interpretation of the New Jersey gratuity law and the improper fashioning of a jury charge based upon an incorrect legal analysis violated defendants' federal constitutional right to due process and to a fair trial;

> (3) In violation of defendant Mattison's federal constitutional right to due process and to a fair trial, the district court erred in failing to sever the case against defendant Mattison from the case against defendant Bradley;

> (4) Defendant Mattison's federal, constitutional r ights to due process and to a fair trial and the rights of defendant Mattison under the Federal Sentencing Guidelines were violated by the district court's failure to grant him a downward departure at the time of sentencing;

> (5) Defendant Mattison's federal constitutional right to due process and to a fair trial and the rights of defendant Mattison under the Federal Sentencing Guidelines were violated by the imposition of a two-point increase under an alleged multiple bribe theory;

> (6) Federal constitutional rights to due process a nd to a fair trial were violated by the district court's failure to grant defendants' motion for judgment of acquittal and motion for a new trial.

We have reviewed these contentions and conclude that they are clearly without merit and thus we reject the contentions without further discussion.

13

III. CONCLUSION

For the foregoing reasons we will affirm the judgments of conviction and sentence entered July 16, 1997.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

14