**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

**v.**

**NICHOLAS ALBERT, Appellant**

D.C. CRIM. APP. NO. 1997/004, Re: T.C. CRIM. NO. F934/1995

District Court of the Virgin Islands

Division of St. Croix

February 2, 2000

BETHANY J. VAZZANA, ESQ., ANDREW C. SIMPSON, ESQ., *Bryant, Barnes & Simpson, P.C.*, St. Croix, U.S.V.I., *for appellant*

MAUREEN PHELAN CORMIER, ESQ., *Virgin Islands Dept. of Justice*, St. Thomas, U.S.V.I., *for appellee*

FINCH, *Chief Judge*, MOORE, HODGE,[1] *Sitting by Designation.*

---

[1] The Honorable Verne A. Hodge retired as Presiding Judge of the Territorial Court on November 6, 1999.

## OPINION OF THE COURT

This appellate panel is called upon to decide: 1) whether the trial judge erred in denying appellant's motion to suppress his confession; 2) whether the trial judge abused his discretion in allowing the videotape of the crime scene; and 3) whether the trial court's felony murder instruction improperly advised the jury of the law.

## FACTS

Barbara Cromwell ["Mrs. Cromwell"] was found murdered in her apartment at the Cruzan Princesse Condominiums ["Cruzan Princesse"] on November 29, 1995. An autopsy revealed that Mrs. Cromwell had struggled with her assailant(s) before she was killed; that some of her injuries were likely to have occurred before she was tied up; and that major blood vessels in her neck had been cut, resulting in excessive bleeding, and ultimately death. (Joint Appendix to Appellant's Brief ["J.A."], Vol. III at 471-72.)

Mrs. Cromwell's assailant(s) also stole her car and many items of personal property from her apartment. The car was found at the Nicasio Nico housing community, and a search warrant was issued for Building 11, Apartment 55 of that community based upon an anonymous tip. Approximately 72 items believed to be stolen from Mrs. Cromwell's apartment were collected from Apartment 55. The prime suspects were fifteen-year-old Nicholas Albert ["Albert" or "appellant"] and his friend Johnnie Kidd.[2]

The police contacted appellant's father, Anibal Albert Bonano ["Bonano"] regarding his son's whereabouts. Bonano agreed to inform the officers of his son's whereabouts, if or when it became known to him. On Sunday, December 3, 1995, Albert called his father, told him he wanted to turn himself in, but wanted to talk to him first. The two met at a friend's house briefly on the 3rd and agreed to go to the police station the following day. At approximately 11:00 a.m. on December 4th, Bonano accompanied appellant to police headquarters to turn himself in.

---

[2] Johnnie Kidd was tried separately and convicted of three counts of murder first degree, one count of kidnapping, and one count of burglary first degree. He was sentenced to life without parole on the murder convictions, twenty years for kidnapping, and thirty years on the burglary conviction.

Albert and his father were met by Sergeant Ismael Ramirez ["Ramirez"] at police headquarters. Ramirez escorted them to an interview room where Detective Terrence Desormeaux ["Desormeaux"] soon joined them. According to Desormeaux and Ramirez, appellant was read his *Miranda*[3] rights in his father's presence, and both appellant and his father signed forms stating that they had read, understood and waived those rights. Ramirez also testified that after the *Miranda* warnings were given and waived, he advised Albert to tell the truth. The officers testified that neither appellant nor his father requested an attorney at any time. Appellant then gave a statement detailing his involvement in the burglary.

Ramirez left the interview room at one point, and was replaced by Corporal Louis Pereira ["Pereira"]. The officers all testified that appellant and his father appeared to be normal and not under the influence of any drugs or alcohol. Ramirez, Desormeaux and Pereira all wore civilian clothing, and none of them had weapons or handcuffs. The officers also testified that appellant was offered food during the interview, but he refused. Instead, Albert ate a snack that his father had brought along. After the interview, Ramirez gave Bonano a ride home and returned to headquarters with a hamburger appellant had requested.

Bonano presented a different version of the facts. He testified at trial that before the interview, he informed Ramirez and Desormeaux that his son wanted to cooperate, but that he also wanted an attorney. Bonano further contended that the officers told him it would be "difficult to get ahold [sic] of an attorney at that particular moment." (*Id.*, Vol. IV at 719.) Bonano testified that his son gave a statement based upon the belief that he could not get a lawyer at that time, and signed the waiver of his rights after giving the statement. Both appellant and his father apparently believed that appellant would clear himself of the murder charge by confessing to his role in the burglary.

After a trial by jury, appellant was convicted of the following offenses: Count II, Murder First Degree; Count III, Conspiracy to Commit Burglary; Count IV, Conspiracy to Kidnap; Counts V and

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

VI, Burglary First Degree; and Count VII, Kidnapping. Appellant now appeals the trial judge's admission of his confession; the decision to admit the videotape into evidence; and the felony murder instruction.

## DISCUSSION

### A. Jurisdiction and Standards of Review

This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all criminal cases in which the defendant has been convicted, other than a plea of guilty. V.I. CODE ANN. tit. 4, § 33; Section 23A of the Revised Organic Act of 1954.[4] Findings of fact are subject to a clearly erroneous standard of review, and the court exercises plenary review over questions of law. 4 V.I.C. § 33; *see Rivera v. Government of the Virgin Islands*, 37 V.I. 68, 73, 981 F. Supp. 893 (D.V.I. App. 1997).

### B. Whether the Trial Court Erred in Denying Appellant's Motion to Suppress his Confession.

On December 4, 1995, after acknowledging and waiving his *Miranda* rights, appellant gave a statement to police confessing to his involvement in the burglary of the Cromwell apartment, and also admitting that he assisted in tying Mrs. Cromwell to the bed. (Brief ["Br."] of Appellant at 7-11; J.A., Vol. IV at 641-55.) Appellant stated that Johnnie Kidd a/k/a "Elf" murdered Mrs. Cromwell while appellant was in the process of selecting and removing items from her apartment. After reviewing the statement as written by Desormeaux, appellant requested changes which Desormeaux made. Appellant and his father then initialed each page of the nineteen-page statement.

Appellant alleges that the trial court erred in admitting his confession, because his request for counsel — prior to giving the statement — was not honored. The government contends first, that no request for counsel was made; second, if a request was made questioning would have ceased immediately; third, that the trial

---

[4] Revised Organic Act of 1954, § 23A, 48 U.S.C. § 1614, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 159-60 (1995) (preceding V.I. CODE ANN. tit. 1).

judge's findings of fact are not clearly erroneous; and fourth, that the trial court did not err as a matter of law in finding that there was no custodial interrogation.

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody . . . ." *Government v. Christopher*, 38 V.I. 193, 197, 990 F. Supp. 391 (D.V.I. App. Div. 1997) (quoting *Miranda*, 384 U.S. at 444). "Interrogation," as conceptualized in *Miranda*, "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). *Miranda* seeks to deter situations where a police-dominated atmosphere generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. The term "interrogation" under Miranda:

> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Innis*, 446 U.S. at 301.

The trial judge listened to the parties' arguments, heard testimony, observed the demeanor of the witnesses, and found in pertinent part that:

> 1) Defendant is of sufficient intelligence to have understood his rights, and to intelligently waive it, if he chose to do so. (*Id.* at 155.)

> 2) In addition to the defendant's intelligence, age, and education background, as well as his physical and mental condition, which was considered good, the Court also considers the defendant's familiarity with the criminal justice system; and that . . . sometime in the past, [he] had been advised of his rights and waived his rights before in connection with the making of a statement. (*Id.* at 155-56.)

188

3) [D]efendant's motivation for going to the police in the first place was . . . to clear himself of the allegation that he was somehow involved in the murder. (*Id.* at 156.)

4) [That] defendant's own statements or testimony as to what he thought . . . were, to some extent, conflicting. (*Id.* at 157.)

5) [C]onsidering the defendant's motive for going in to the police, the Court would find that his decision to go to talk to the police was voluntary, despite the fact that it may have been in request — his response to a request by the police to his father, that they wanted to talk to him. The defendant at that point could have chosen not to go to the police. (*Id.* at 159-60.)

6) Considering his motivations, as well as the conditions under which the questioning took place . . . a reasonable person in his position . . . would not feel that they were in custody or not free to leave. (*Id.* at 160.)

7) Under those circumstances, the Court would find that the warnings that were given in this case were not legally required. Therefore . . . whether or not the defendant invoked his *Miranda* warnings is irrelevant. (*Id.* at 160.)

8) [E]ven if the Court was to find that the defendant was in custody, the Court would, nevertheless, conclude that the defendant's *Miranda* rights were waived, in any event. . . . [and] that the defendant's waiver was voluntary and intelligent. (*Id.* at 162.)

9) [After] observ[ing] the demeanor of all witnesses . . . . The Court concludes that . . . based merely upon the preponderance of the evidence standard, that the defendant's right to counsel was not invoked. And therefore, his right to counsel, the Court would find, was waived . . . [v]oluntarily, knowingly, and intelligently. (*Id.* at 167-68.)

10) [T]he Court will also note as pointed out by the government, the defendant's awareness of his right not to

volunteer to make statements, by his refusal to answer one of the questions . . . shows the absence of any coercion or pressure. The Court would, therefore, find that his will was not overborne in this case, that his statement was voluntary. (*Id.* at 169.)

Based upon these findings of fact, the trial judge denied appellant's motion to suppress.

The trial court's findings of fact regarding the events surrounding appellant's statements and his waiver of his *Miranda* rights are subject to a clearly erroneous standard of review. The ultimate determination of whether there was a custodial interrogation in light of the court's properly found facts, however, is a question of law over which this Court exercises plenary review. *See United States v. Riddick,* 156 F.3d 505, 509 (3d Cir. 1998) (citations omitted); *Brown v. Government of the Virgin Islands,* 40 V.I. 141, 1998 U.S. Dist. LEXIS 20145, 1998 WL 959655, at *2 (D.V.I. App. Div. 1998); *Christopher,* 38 V.I. at 196; *United States v. Harris,* 44 F.3d 1206, 1209-10 (3d Cir. 1995) (citing *Miller v. Fenton,* 474 U.S. 104, 115-17, 88 L. Ed. 2d 405, 106 S. Ct. 445 (1985)); *United States v. Deaner,* 1 F.3d 192, 196 (3d Cir. 1993) (citation omitted).

■ In determining whether a person is in police custody, the court must: first, examine the circumstances surrounding the interrogation; and second, determine whether a reasonable person under the same circumstances would have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane,* 516 U.S. 99, 133 L. Ed. 2d 383, 116 S. Ct. 457 (1995). Here, although the trial judge determined that there was an interrogation, his detailed account of the factors considered before finding that defendant was not in "custody" is not clearly erroneous.

■ The onus is on the government to show that the relinquishment of defendant's rights was voluntary, and that the defendant had full awareness of the right being waived and the consequences of waiving that right. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986). Alternatively, the trial court found that appellant's waiver of his rights was knowing and voluntary, assuming arguendo that appellant was in custody. There was no evidence presented suggesting that Albert was

abused or coerced into giving the confession. In showing deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence, this Court may only find clear error if there is a "definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948)). This Court finds that the trial court applied the proper law to factual findings that were not clearly erroneous, and did not err in admitting appellant's confession.

## C. Whether the Trial Court Abused its Discretion by Admitting the Videotape Into Evidence.

Upon arrival at Mrs. Cromwell's apartment on November 29, 1995, Sergeant Jonathan Hitesman ["Hitesman"], a forensic investigator, took photographs,[5] videotaped what he saw, and collected evidence. At trial, the government sought admission of the videotape into evidence. Defense counsel objected on grounds that it was narrated, and also because its prejudicial nature outweighed its usefulness. Defense counsel further argued that

> [s]ome of the shots are close-ups of the neck area, showing the cut. It's awful. It's not necessary. A lot of what the video tends to portray is not in issue. I could only surmise that the Government is using the video to instill horror, to instill punishment, the element of punishment.
>
> They have other ways of presenting the scene to a lay jury.
>
> . . . .
>
> So, it's not just unduly prejudicial, its cumulative. Indeed, for us to sit and watch the video and then turn around and have to watch the still photos is a waste of time.

(J.A., Vol. II at 239-41.)

---

[5] The photographs admitted into evidence are included in the Joint Appendix, but have not been raised on appeal. (J.A., Vol. VI at 1093-98.)

Appellant argued on appeal that the mere fact that the same trial judge precluded the showing this videotape in the subsequent trial of Johnnie Kidd is a clear indication that the trial judge acknowledged his error. The government countered that: 1) probative value of the videotape outweighs its prejudicial effect; 2) although the tape is forty-five minutes long, the government fast forwarded it nine times, thereby making the presentation to the jury much shorter; 3) the videotape shows that the shoelaces used to tie Mrs. Cromwell did not have a drop of blood on them, although the wall directly behind her was covered in blood, indicating that she could not have been tied when she was being slashed; 4) the trial judge did not acknowledge any error by precluding the videotape in the Kidd case because Kidd faced different charges, different evidence, and relied upon a different defense; 5) despite defense counsel's assertion that the tape was so gruesome that a juror cried, neither the judge nor counsel for the government saw any emotional reaction from the jurors (*see* J.A., Vol. III at 416-17); and finally 6) "a true representation of a gruesome crime scene must, to some extent, be gruesome." (Br. of Appellee at 25-30.)

The Federal Rules of Evidence provide that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED. R. EVID. 403. In making a Rule 403 determination, the trial court "is required to balance the probative value of evidence against its prejudicial effect. The [trial] court must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant." *United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999) (quoting *Government of the Virgin Islands v. Archibald*, 28 V.I. 228, 987 F.2d 180, 186 (3d Cir.1993) (internal quotation marks and citations omitted)). If in this case, the videotape had a legitimate purpose and there was not "an overwhelming probability" that the jury would have been "unable to follow the limiting instructions," or "a strong likelihood" that the evidence would be "devastating" to the defendant, then it

could be allowed pursuant to FED. R. EVID. 403. *Bradley*, 173 F.3d at 230 (quoting *United States v. Vaulin*, 132 F.3d 898, 901 (3d Cir. 1997)).

After viewing the videotape *in camera*, the trial judge found it was relevant to and probative of the issues at trial, and that this evidence was not so inflammatory that its probative value substantially outweighed its prejudicial effect. The judge agreed with defense counsel, however, that the "opinionated narration throughout" should be barred from the jury. (J.A., Vol. II at 381.) Accordingly, the videotape was shown to the jury without audio. While deliberating, the jurors asked to see the videotape again. The trial court allowed the second viewing, but instructed the jurors as follows:

> As you will recall, however, the only portion of the video, that has been admitted into evidence — and, therefore, the only portion that you are permitted to consider, as evidence — is merely what's seen on the video, as opposed to the audio or what's said on it.
>
> So, we would have prepared the television for you. And it would allow you to look at it. But it would not allow you to see the video or to — to hear, rather, any of the audio or to increase the volume in any way.

(J.A., Vol. VI at 1054.)

The trial judge's decision to admit or exclude evidence under Rule 403 may not be reversed unless it is "arbitrary and irrational," but the trial court should articulate its balancing analysis. *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 786 (3d Cir. 1996) (internal citations omitted). Once the trial court has articulated the basis for its determination of admissibility under Rule 403, that determination is reviewed for abuse of discretion. *United States v. Himelwright*, 42 F.3d 777, 781 (3d Cir. 1994) (citations omitted).

This Court, having viewed the videotape in its entirety, was particularly concerned by the extent to which it focused on the exposed genitalia of the victim. While it is essential in our system of justice that jurors have a true representation of a crime, the government's theory of the prosecution did not include any sort of sexual crime. The jury had access to the entire tape during their deliberations, and the Court cannot assume that they did not view

those sections that had been fast-forwarded during the presentation of the case.

■ What saves this case from reversal is appellant's failure to ask the trial judge to require the government to edit out or redact these unnecessary portions of the tape before it was shown to the jury or to particularize his general objection to the tape. While Albert objected to the videotape, he raised its prejudicial nature overall and focused primarily on the cumulative effect of showing both the video and the still photographs, one of which also showed the exposed lower genitalia. Appellant only requested that the trial judge "limit the Government's number of [still] photographs." (J.A., Vol. II at 240.) Accordingly, this Court finds that the trial judge did not abuse his discretion in admitting the videotape into evidence. The Court takes this opportunity, however, to caution the government that it risks reversal by attempts to prove its case on a show-all quantitative approach.

### D. Whether the Trial Court's Instruction on Felony Murder was Erroneous and Constituted Plain Error.

The gravamen of Albert's argument is that the trial court refused to give his proposed instruction and "seriously impaired [his] ability to conduct his defense." (Br. of Appellant at 32.) Appellant specifically contends that if the homicidal act allegedly committed by Johnnie Kidd fell outside the scope of the burglary that he and appellant undertook to commit, then appellant could not be found guilty of felony murder. Appellant further contends that because he had already confessed to his involvement in the burglary, the trial court's instruction invaded the province of the jury in that it effectively directed a verdict of guilty on the felony-murder charge. The government argues that the felony-murder instruction was a correct statement of law, and that appellant's proposed instruction, taken as a whole, misstates the law.

The Virgin Islands Code provides in relevant part that "all murder which is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem is murder in the first degree." 14 V.I.C. § 922(a)(2). The trial court gave the following instruction on Count II, Murder First Degree:

194

You may not find the defendant guilty of Murder in the First Degree, that is, Felony Murder, unless you find beyond a reasonable doubt that at the time of the killing the defendant was engaged in the perpetration of a — of a burglary. The phrase "in the perpetration of" means during the commission of and includes the period during flight from a crime scene.

Before you may find the defendant guilty of Murder in the First Degree, that is, Felony Murder, you must first find that the Government has proven each [of] the following essential elements beyond a reasonable doubt: First, that the defendant either killed Barbara Cromwell or an accomplice of the defendant killed Barbara Cromwell while acting in furtherance of the felonious undertaking; in this case, a burglary. Two, that the killing was without lawful justification.

Three, that the defendant acted with malice aforethought. Fourth, the killing was committed during the perpetration of — of a burglary; and fifth, that the act occurred on or about and between November 28, 1995 and November 29, 1995, in the Judicial District of St. Croix.

(J.A., Vol. VI at 1024-25.)

"Generally, we review the district court's refusal to give certain jury instructions on an abuse of discretion standard. However, where, as here, the question is whether the jury instructions failed to state the proper legal standard, this court's review is plenary." *Gov't of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1180 (3d Cir. 1995) (citing *Savarese v. Agriss*, 883 F.2d 1194, 1202 (3d Cir. 1989)).

Defense counsel objected to the court's definition of the term, "in the perpetration of", stating:

In short, I am requesting that the Court instruct "in the perpetration of," means engaging in the activities which make up the elements of the underlying offense.

I do not believe, Judge, that it should be limited to the duration of time it takes to accomplish a particular offense. . . . But should be tailored to the activities which make up the essential elements of the underlying charge.

195

By way of example, I submit that if there is to be a felony murder in a burglary, the murder has to occur either at the time of the break-in or at the time of the [entry] of the premise. If it doesn't happen while those essential elements of the burglary occur[], then it's not felony murder under burglary.

(*Id.*, Vol. V at 864-65.) Defense counsel, therefore, sought to have the following felony murder instruction submitted to the jury:

The homicide is committed in the perpetration or attempt to perpetrate a burglary, when the accused is engaged in any act required for the full execution of the burglary, such as the unlawful breaking and entering the dwelling house belonging to another, with intent to steal, and when there is no break in the chain of events, leading from the burglary to the act causing death; so that, the homicide is linked to part of a series of incidents forming one continuous transaction. When, however, there is a break in the chain of events leading from the burglary, as by the defendant's abandonment of the burglary, a sub- sequent homicide is committed by the defendant or defendants, is not one committed in the perpetration or attempt to perpetrate a burglary.

Your Honor, that requested jury instruction was taken from the Am Jur 2d. *And counsel left out of it a couple of sentences, in the middle. One of them says: The application of the felony murder doctrine does not require that the underlying crime shall have been technically completed at the time of the homicide; nor does it matter at what point of the underlying felony the homicide occurs.*

That was omitted.

(*Id.* at 867-68) (emphasis added).

■ The Court finds that the language omitted by defense counsel significantly changed the legal theory behind the felony murder rule, and the trial judge's instruction did not constitute plain error. Even if this proposed instruction were allowed, there is no evidence to support the theory that appellant abandoned the burglary at any point. Moreover, the trial court's instruction did

196

not deviate from the law in this jurisdiction. "While the jury charge regarding applicable law is subject to plenary review, when the substantive legal content of the instruction given by the trial judge accurately states the law, a court's refusal to use specially requested language is reviewed for abuse of discretion." *Antilles Insurance v. James*, 30 V.I. 230, 238 n.3 (D.V.I. App. Div. 1994) (citations omitted). Given this record, the Court finds that the trial judge did not abuse his discretion in refusing to charge the jury with defense counsel's proposed instruction.

## CONCLUSION

In conclusion, this Court finds that the trial judge did not err in denying appellant's motion to suppress his confession; that the judge did not abuse his discretion in admitting videotape into evidence; and that there was no plain error in the felony murder instruction which properly advised the jury of the law.

MOORE, J., concurring in the result.

I write separately because I believe that the Territorial Court judge abused his discretion in allowing the entire videotape to be shown to the jury over appellant's objection that it was unduly prejudicial and cumulative. The trial court erred by not requiring the prosecutor to redact the highly inflammatory portion of the tape, described as "15 minutes of gore" by appellant,[6] the prejudicial value of which clearly outweighed its limited probative value. Not only is this segment of the videotape extremely gruesome, graphic, and gory, but the extent to which it focused on the exposed genitalia of the partially clothed victim is appalling, especially in the absence of any evidence that the victim had been sexually molested. Furthermore, it was unnecessary, inflammatory, and prejudicial for the jury to have been exposed to the camera's extended panning over the victim's exposed sexual organs, since the prosecution always conceded that the victim had not been sexually molested.[7] These graphic and inflammatory portions of the video rendered the entire tape unfairly prejudicial.

---

[6] (*See* Br. of Appellant at 25.)

[7] It must be assumed that the jury reviewed these unnecessarily offensive sections during its unsupervised access to the entire tape in the jury room, whether or not this was one of the portions past which the prosecutor fast-forwarded in the courtroom.

In addition to being unduly prejudicial, the videotape was cumulative and otherwise unnecessary to the prosecution. For example, the government had a detailed diagram of the entire bedroom, which more than adequately depicted the position of the victim and her injuries, including the defensive wounds on her arms and legs, and other items the government argues were necessary to show Albert's participation in the crime. (*See* J.A. vol. 6, at 1071-72.) Moreover, the prosecution introduced six similarly graphic color photographs of the victim and her wounds the government argues were necessary to show Albert actually participated in the killing. Although appellant objected to the photographs at trial, he has not appealed their admission into evidence.

Photographs 123 and 124, for example, are blow-ups of the victim's arms that display the many defensive cuts and much blood, but that also clearly show no blood on either of the white shoe laces tying her wrists to the bed's headboard. The government introduced these photographs as evidence that Albert lied about tying the victim to the bed while she was still alive and before she had been cut, since the laces were not spattered with blood, (see government's closing argument, *id.*, at 943, 946, 1006-07), and that he lied about not helping with the murder, since the amount of blood from the extensive defensive wounds evidenced a struggle requiring both Albert and his accomplice to restrain the victim while she was being stabbed, (*see id.*, at 945-46, 994-95). In addition, photograph 118 is a side-view of the decedent's body and photographs 121 and 122 show the injuries to her neck and face, before and after the wide plastic tape has been removed.[8]

To the extent that the gore and genitalia shown on the videotape had any relevance or probative value, it was cumulative to the color photographs of the victim and her wounds admitted in evidence, and inflammatory nature of the videotape obviously outweighed its probative value. The videotape depiction of the

---

[8] (*See* Exhibits 118, 121, 122, 123, and 124, reproduced in J.A. vol. 6, at 1093-98.) The first three photographs were admitted during the testimony of the pathologist, Dr. Francisco Landron. (*See* J.A. vol. 3, at 419-22 (Exs. 118, 121, 122).) The next two photographs were identified by Dr. Landron, (*see id.* at 423, 463 (Exs. 123, 124)), and admitted later, (*see* J.A. vol. 4, at 669-70).

victim's exposed genitalia, of course, had absolutely no probative value or relevance.

I reluctantly conclude, however, that the trial court's abuse of its discretion in admitting the entire videotape and allowing it to be played by the jury during their deliberations did not constitute reversible error in light of the other, overwhelming evidence that appellant committed felony murder, which is clearly summarized by the majority opinion. I therefore must concur in the majority's affirmance of the jury's verdict. Nevertheless, I forcefully caution the government that it risks reversal by overzealous attempts to sway the jury with such unnecessarily inflammatory and unduly prejudicial evidence, which would require reversal under other circumstances.

## ORDER OF THE COURT

AND NOW this 2 day of February 2000, having considered the arguments and submissions of the parties, and for the reasons set forth in the Court's accompanying opinion of even date, it is hereby

ORDERED AND ADJUDGED that the rulings of the Territorial Court are AFFIRMED.